**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BRUCE BELSON, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | )    No. 12 C 4474 |
| | ) |
| OLSON RUG COMPANY, | )    Judge Ruben Castillo |
| | ) |
| Appellee. | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Appellant Bruce Belson ("Belson" or "Appellant") brings this appeal from an order of the

Bankruptcy Court sustaining the Debtor/Appellee Olson Rug Company's ("Appellee") Objection

to Proof of Claim No. 21 Filed by Bruce Belson, which denied priority status to Appellant's

Claim pursuant to 11 U.S.C. § 507(a)(4) and reduced the amount of Appellant's Claim pursuant

to 11 U.S.C. § 502(b)(7). The appeal is timely before this Court. For the reasons set forth

herein, the decision of the Bankruptcy Court is affirmed.

### RELEVANT FACTS

Belson was employed by Appellee as a salesman. (R. 5, Jt. Appellate Status Report at 1.)

Belson was an "at-will" employee. (*Id.*) On March 12, 2007, Belson's employment was

terminated, effective March 19, 2007. (*Id.* at 2.) Belson filed a common law retaliatory

discharge claim against Appellee in the Circuit Court of Cook County, styled *Bruce Belson v.*

*Olson Rug Company*, Case No. 2008 L 12622. (*Id.*) On May 13, 2011, Belson obtained a jury

verdict of $350,865.51 against Appellee in *Bruce Belson v. Olson Rug Company*. (*Id.*) The

jury's award consisted of $156,875.51 in back pay; $43,990 in front pay; and $150,000 in

1

damages for emotional distress. (*Id.*)

## PROCEDURAL HISTORY

On July 15, 2011, Appellee filed a voluntary Chapter 11 bankruptcy petition. (*Id.*) On September 20, 2011, the Bankruptcy Court entered an order establishing October 13, 2011 as the deadline for creditors other than governmental units to file proofs of claim in this Chapter 11 case. (*Id.*) On October 12, 2011, Appellant filed a Proof of Claim for $356,229.13, representing the amount of the retaliatory discharge judgment plus interest accrued through the date of the Chapter 11 petition. (*Id.* at 3.) Appellant also claimed priority status on $11,725 of the judgment, asserting that such amount should be treated as wages, salaries, or commissions earned within 180 days of the filing of the bankruptcy petition pursuant to 11 U.S.C. § 507(a)(4). (*Id.*)

On February 21, 2012, the Bankruptcy Court entered an order that, among other things, confirmed the "Second Amended Chapter 11 Plan of Reorganization of Olson Rug Company Pursuant to Chapter 11 of the Bankruptcy Code" (the "Plan"). (*Id.*) Appellant is classified under the Plan as a general unsecured creditor. (*Id.*) Among other things, the Plan contemplates that, on the Effective Date, the Reorganized Debtor will contribute $29,000 to the Plan Escrow to satisfy the claims of general unsecured creditors, which amount will be supplemented by four annual payments of $10,000 to general unsecured creditors following the Effective Date, for a total payment of $69,000 to general unsecured creditors. (*Id.*) Appellant believes that, other than Appellant's Claim, the total allowable general unsecured claims is $94,384.44. (*Id.*)

On March 5, 2012, Appellee filed the "Debtor Olson Rug Company's Objection to Proof of Claim No. 21 Filed by Bruce Belson" (the "Objection"). (*Id.*) In the Objection, Appellee argued that no portion of Appellant's judgment constituted wages, salaries, or commissions

earned within 180 days of the filing of the bankruptcy petition, and thus no portion of the judgment should be entitled to priority status pursuant to 11 U.S.C. § 507(a)(4). (*Id.*) Appellee further argued that Appellant's retaliatory discharge claim constituted a claim for damages "resulting from the termination of an employment contract" pursuant to 11 U.S.C. § 502(b)(7) and thus should be capped at one year's pay in the amount of $49,193.12 (reflecting Appellant's annual compensation at the time of his employment termination). (*Id.* at 3-4.) Appellee requested the entry of an order: (a) reclassifying the entire amount of the Claim as a "Class 7 Other General Unsecured Claim" under the Plan; and (b) reducing the aggregate allowable amount of the Claim to, and capping it at, $49,193.12 pursuant to section 502(b)(7) of the Bankruptcy Code. (R. 7, Appellee's Br. at 4-5.) On April 12, 2012, the Bankruptcy Court entered an order sustaining Appellee's Objection in its entirety, thereby denying priority to Appellant's Claim and capping it at $49,193.12. (R. 5, Jt. Appellate Status Report at 5.)

On April 26, 2012, Appellant filed a Notice of Appeal of the April 12, 2012 order of the Bankruptcy Court. (*Id.*) The appeal was docket by this Court on June 8, 2012. (R. 1, Appeal.) The jurisdiction of this Court to hear this appeal is invoked pursuant to 28 U.S.C. § 158(a)(1). (R. 6, Appellant's Br. at 1; R. 7, Appellee's Br. at 1.) Appellant timely filed his brief on June 22, 2012, (R. 6, Appellant's Br.), and Appellee filed its response brief on July 6, 2012, (R. 7, Appellee's Br.). Appellant filed his reply brief on July 16, 2012. (R. 10, Appellant's Reply Br.)

The questions presented in this appeal are: (1) whether the Bankruptcy Court erred in finding that Appellant's claim is not entitled to priority status pursuant to 11 U.S.C. § 507(a)(4); and (2) whether the Bankruptcy Court erred in finding that Appellant's claim should be reduced pursuant to 11 U.S.C. § 502(b)(7). (R. 5, Jt. Appellate Status Report at 4.)

## LEGAL STANDARD

The Court uses a dual standard of review of when adjudicating bankruptcy appeals. *See Arrow Rd. Constr. Co. v. Bridgeview Bank Grp. (In re Brittwood Creek, LLC)*, 450 B.R. 769, 773 (N.D. Ill. 2011). The bankruptcy court's determinations of law are reviewed *de novo* while its findings of fact are reviewed for clear error. *See Wiese v. Cmty. Bank of Cent. Wis.*, 552 F.3d 584, 588 (7th Cir. 2009) (citing *In re ABC-Naco, Inc.*, 483 F.3d 470, 472 (7th Cir. 2007)). However, where the Bankruptcy Code commits a decision to the discretion of the bankruptcy court, that decision is only reviewed for an abuse of that discretion. *See Wiese*, 522 F.3d at 588 (citing *In re Fortney*, 36 F.3d 701, 707 (7th Cir. 1994)).

There are no factual issues in dispute in this appeal and the only disputed issues on appeal are matters of law; namely, whether the Bankruptcy Court properly applied the law in sustaining Appellee's Objection to Appellant's Claim. (R. 7, Appellee's Br. at 5.) Therefore, the Court reviews this appeal *de novo*. *See Wiese*, 552 F.3d at 588.

## ANALYSIS

### I. The priority of Appellant's Claim under section 507(a)(4) of the Bankruptcy Code

Section 507(a)(4) of the Bankruptcy Code grants a fourth priority right of payment in a bankruptcy case, behind domestic support obligations, administrative expenses, and ordinary course claims to:

> [a]llowed unsecured claims, but only to the extent of $11,725 for each individual or corporation, as the case may be, earned within 180 days before the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first for . . . wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by the individual.

11 U.S.C. § 507(a)(4)(A). For any portion of an employee or former employee's claim to be

entitled to priority under section 507(a)(4) the "wages, salaries, or commissions" must have been *"earned* within 180 days before the filing of the petition." *Id.* (emphasis supplied). Such claims are "earned" under an employment arrangement no later than the termination of the individual's employment. *See In re Thomaston Mills, Inc.*, 329 B.R. 780, 783 (Bankr. M.D. Ga. 2005) (severance payment owed to employee prior to the priority period of section 507(a)(3), now section 507(a)(4), was "earned" upon termination and was not entitled to priority status); *In re Murray Indus., Inc.*, 114 B.R. 749, 751 (Bankr. M.D. Fla. 1990) (where employee was terminated more than a year prior to the debtor's bankruptcy, the claim filed by the claimant, to the extent the claim was a wage priority claim under section 507(a)(3), now 507(a)(4), it was not allowable because it was not for wages earned by the claimant within the ninety, now 180, day period provided by the statute, and therefore if the amount was a valid claim, it could only be allowed as a general unsecured claim); *In re Gen. Info. Servs., Inc.*, 68 B.R. 419, 421 (Bankr. E.D. Pa. 1986) (wages became "fixed and unconditional" for the purposes of section 507(a)(3), now section 507(a)(4), on the date of the employee's termination).

At least one court in this District has applied a more restrictive standard and held that "severance benefits are earned pro rata over the period of the employee's employment." *In re Demert & Dougherty, Inc.*, No. 96 B 851, 1999 WL 1140859, at *4 (Bankr. N.D. Ill. Dec. 13, 1999) (citing *In re Nw. Eng'g Co.*, 863 F.2d 1313 (7th Cir. 1988)). In *Demert*, the court limited "priority to the portion of the pre-petition severance pay for the ninety [now 180] days prior to the filing of the bankruptcy petition." 1999 WL 1140859, at *4.

Even statutory damages related to termination of employment are deemed to be "earned" upon the termination of the employee. *See In re Cargo, Inc.*, 138 B.R. 923, 927 (Bankr. N.D.

Iowa 1992) (holding that Worker Adjustment and Retraining Notification Act ("WARN") damages, 29 U.S.C § 2101 *et seq.*, are "earned" for the purposes of section 507(a)(3), now 507(a)(4), "not over a period of employment, but upon termination"); *see also In re Kitty Hawk, Inc.*, 255 B.R. 428, 438 (Bankr. N.D. Tex. 2000) ("[T]he employees earned the WARN pay upon termination.") (internal quotation marks omitted); *In re Hanlin Grp., Inc.*, 176 B.R. 329, 333-34 (Bankr. D.N.J. 1995) ("Back pay under WARN is deemed to be earned at the date of termination.").

In granting the Objection, the Bankruptcy Court noted that the Appellant's "termination was the relevant fact, and that was . . . long before [the 180 days] on the priority claim." (R. 1, Appeal, Ex. A at 101.) The Bankruptcy Court further explained:

> A plain reading of the statute requires the wages to be "earned" within 180 days of the petition. Logically wages cannot be earned after a creditor's employment with the debtor has been terminated. Mr. Belson was terminated on March 19, 2007, years before the relevant 180-day period. Whatever portion of the judgment represents wages "earned," those wages were earned as of that date in 2007. The court's interpretation is supported by the cases cited by the debtor holding in various contexts that wages are "earned" as of the date of [the] employee's termination.

(*Id.* at 103) (citations omitted).

Appellant argues that, although he was discharged over four years prior to the Petition Date, he is entitled to a priority Claim for back pay that "continued to accrue" until a jury rendered a verdict on his retaliatory discharge claim. (R. 6, Appellant's Br. at 5.)[1]  Appellant

---

[1] Before the Bankruptcy Court, Appellant only argued that the back pay component of his judgment should be entitled to priority pursuant to section 507(a)(4). (R. 1, Appeal, Ex. A at 79.) Now Appellant asserts that both "the back pay and front pay accrued during the period within 180 days prior to Olson Rug's Chapter 11 petition should be given priority status under 11 U.S.C. § 507(a)(4)." (R. 6, Appellant's Br. at 9.) Because Appellant failed to raise the argument that the front pay should be entitled to priority below, that argument has been waived. *See*

tries to distinguish the cases cited above by arguing that severance pay and WARN Act damages are different from back pay, which he claims is entitled to priority under section 507(a)(4) of the Bankruptcy Code. (*Id.* at 7.) Back pay must be entitled to priority, Appellant argues, because "[t]here is no way to know the extent of an employee's back pay on the date of his termination, as there is no way to know at that time whether, and if so to what extent, the employee will be able to replace his income." (*Id.*) Appellant's argument confuses the calculation of damages with the right to payment of damages. (R. 7, Appellee's Br. at 9.)

The cases cited by Appellant himself support the proposition that wages can only be "earned" in accordance with section 507(a)(4) of the Code during the employment period. *See In re Gen. Info. Servs., Inc.*, 68 B.R. at 421 (denying priority status to claims where the employee was terminated prior to the ninety-day, now 180-day, period and noting "[t]he fact that payments, 'as a matter of accounting,' were to continue over a three months [sic] period following his termination is irrelevant for the purposes of determining priority status under § 507.").

Although Appellant relies on *General Information Services* to support his argument that his back pay damages only became "fixed and unconditional" on the date of the jury's verdict, which occurred within the statutory period, (R. 6, Appellant's Br. at 8), it does not follow that Appellant's Claim is thereby automatically entitled to priority. In rejecting the creditor's claim of a right to priority, the court in *General Information Services* noted that the claimant's "right to receive severance pay was fixed and unconditional on the date of his termination," which was

---

*Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) (noting the Seventh Circuit's long-held view that issues and arguments are waived on appeal if the appellants did not raise them before the trial court). Appellant concedes that because his "back pay exceeds the amount entitled to priority under 11 U.S.C. § 507(a)(4), whether his front pay should be given priority status is irrelevant." (R. 10, Appellant's Reply Br. at 3.)

outside the statutory period. 68 B.R. at 421. Appellant assumes that the inverse of this must be true: that whenever pay becomes "fixed and unconditional" that claim has been "earned." (R. 6, Appellant's Br. at 8.) This is simply incorrect. In *General Information Services* the claim became "fixed and unconditional" upon the date of termination, which also marked the end of the employment period when wages can be "earned." 68 B.R. at 421. It does not follow that the claim would have been entitled to priority if the claim had become "fixed and unconditional" within the 180-days prior to the debtor's bankruptcy filing. Nevertheless, section 507(a)(4) does not include the phrase "fixed and unconditional," nor does it confer automatic priority status based on the date a judgment is entered, so Appellant's argument derived from *General Information Services* does not establish that his Claim is entitled to priority status.

In addition to *General Information Services*, Appellant relies on two cases to support his argument that the back pay was "earned" within the 180 days preceding the Petition Date. (R. 6, Appellant's Br. at 5-7) (citing *In re Bennet Paper Corp.*, 63 B.R. 8 (Bankr. E.D. Mo. 1985) and *In re Palau Corp.*, 18 F.3d 746 (9th Cir. 1994)). Appellant argues that "[t]he Bankruptcy Court's holding is inconsistent with *In re Bennet* and *In re Palau Corp.* which make clear that back pay is entitled to priority treatment as 'wages, salaries or commissions.'" (*Id.* at 7.) Neither case supports this position.

In *Bennet*, the issue before the court was not the allowance or priority of a claim, but whether to grant the Equal Employment Opportunity Commission ("EEOC") relief from the automatic stay to pursue a pending age discrimination suit against the debtor. 63 B.R. at 10. Finding that the automatic stay applied to the EEOC's action, the court noted in *dictum*, in a single footnote without any citations, that a judgment obtained by the EEOC on behalf of the

individual defendant would have priority over other claimants and used this as a basis to conclude that "the Commission here is acting as little more than a surrogate to enforce contract, tort, or wage claims against the Debtor." *Id.* at 11, 12 n.1. *Bennet* did not address the issue presented in the instant appeal, and Appellant's citation to *Bennet* takes the court's brief mention of section 507 wage priority entirely out of context. Furthermore, as illustrated by the cases cited above, *Bennet*'s analysis of this issue is inconsistent with the majority of cases that have examined the proper application of section 507(a)(4) of the Bankruptcy Code.

In *Palau*, unlike in the instant appeal, the employee-claimants were actually terminated within the statutory period before the filing of the bankruptcy petition. 18 F.3d at 748. As such, the trustee for the debtor did not contest that a portion of the wages were entitled to section 507 wage priority because they were "earned" within the statutory period. *See id.* Appellant's statement that the Ninth Circuit "focused on whether the claim should be entitled to administrative priority status" is misleading. (R. 6, Appellant's Br. at 7.) The Ninth Circuit did not even consider the issue of whether the section 507 wage priority applied to a portion of the claim, and instead only considered whether such claims were entitled to administrative priority. *Palau*, 18 F.3d at 749 ("This appeal stands or falls on the answer to one question: Is the backpay that accrues to an unlawfully discharged employee after his former employer files a petition in bankruptcy entitled to administrative priority as an expense of the bankruptcy estate? For the reasons that follow we conclude that it is not.").

Furthermore, Appellant's attempt to distinguish *Demert*, 1999 WL 1140859, misconstrues the basis for the holding in that case. (R. 6, Appellant's Br. at 8.) In *Demert*, the court only afforded priority "for that portion of the pre-petition severance benefits earned during

the ninety [now 180] days prior to the filing of the bankruptcy petition." *Id.* at *4. In so holding, the court emphasized that "it is the date that [the wages] are earned, *not* the date on which they are *payable*, that is important." *Id.* at *3 (emphasis supplied). The court based this holding on the "view that severance benefits are earned pro rata over the period of the employee's employment." *Id.* at *4 (citing *In re Nw. Eng'g Co.*, 863 F.2d at 1313). Thus, the relevant period for the court to consider was the employment period, not the period during which the claim "accrued."

Regardless of when Appellant's Claim "accrued" or became "fixed and unconditional," it was "earned" for the purposes of the statute on the date of Appellant's termination, at the latest. It was not earned during the 180-day period before the Petition Date because Appellant no longer worked for Appellee during that time. Requiring the claimant to have worked for the debtor within 180 days of the filing of a bankruptcy petition before amounts will be entitled to priority is consistent with the goals of section 507(a)(4) of the Bankruptcy Code. *See* 4 Collier on Bankr. § 507.05[1] (15th ed. 2005) (stating that one of the purposes of the wage priority provisions is "to encourage employees to stand by an employer in financial difficulty"). Granting priority status to a four-year old Claim simply because the judgment supporting that Claim was entered in the 180 days prior to the bankruptcy promotes no purpose or goal recognized by the Bankruptcy Code. Even according to the cases cited in Appellant's brief, Appellant's Claim is not entitled to priority. Therefore, the Bankruptcy Court did not err in holding that Appellant's Claim is not entitled to priority pursuant to section 507(a)(4) of the Bankruptcy Code.

## II. The cap on Appellant's Claim under section 502(b)(7) of the Bankruptcy Code

Section 502(b)(7) of the Bankruptcy Code serves to cap the claims of terminated

employees of the debtor by providing that such claims may be allowed:

> except to the extent that . . . if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds . . . (A) the compensation provided by such contract, without acceleration, for one year following the earlier of . . . (i) the date of the filing of the petition; or (ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus (B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(7); *see also In re Handy Andy Home Improvement Ctrs., Inc.*, No. 95 B 21655, 1997 WL 401583, at *7 (Bankr. N.D. Ill. July 9, 1997) (holding that section 502(b)(7) limited a former employee's claim to (a) severance equal to one-year's salary, plus (b) any compensation due as of the date of the employee's termination that remained unpaid); *In re Uly-Pak, Inc.*, 128 B.R. 763, 768 (Bankr. S.D. Ill. 1991) (holding that a former employee's severance claim was limited by section 502(b)(7) to one-year's salary).

When a claim is based on a state law cause of action, courts have consistently held that section 502(b)(7) applies to cap a former employee's claim, regardless of when the claim arose. *See Anthony v. Interform Corp.*, 96 F.3d 692, 697 (3d Cir. 1996) ("[W]e hold that the express terms of § 502(b)(7) of the Bankruptcy Code mandate that this section be interpreted to place a cap on all employment contract termination claims, regardless of whether: (1) the claim has been reduced to judgment; (2) there is any connection between the employee's termination and the debtor's financial problems; and (3) a number of years has passed between the employee's termination and the debtor's filing of the bankruptcy petition. All of these considerations are irrelevant."); *Johnson v. Beck (In re Johnson)*, 117 B.R. 461, 465 (Bankr. D. Minn. 1990) (holding that section 502(b)(7) "operates to put a cap on the amount of the employment-related claim of a terminated employee of the debtor, regardless of the claimant's asserted or actual right

11

to damages under state law") (internal quotation marks omitted); *Bitters v. Networks Elec. Corp. (In re Network Elec. Corp.)*, 195 B.R. 92, 97-99 (B.A.P. 9th Cir. 1996) (holding that "[o]nce the bankruptcy court determined that the state court judgment resulted from breach of an employment contract, that claim was subject to the application of an exception to allowance provided in the Bankruptcy Code. . . § 502(b)(7) limits damages resulting from termination of an employment contract regardless of when the termination occurred"); *LHI Holding, Inc. v. Levinson (Matter of LHI Holding, Inc.)*, 142 B.R. 1007, 1009 n.2, 1010 (Bankr. M.D. Fla. 1992) (holding that "the character of the claim [under section 502(b)(7)] is not altered simply because it has been reduced to judgment" and that "[s]ection 502(b)(7) is applicable to all claims resulting from the termination, pre-petition or post-petition, of an employment contract"), *aff'd*, 176 B.R. 255 (M.D. Fla. 1994).

In *In re FairPoint Communications, Inc.*, 445 B.R. 271, 273-74 (Bankr. S.D.N.Y. 2011), a district court recently explained that "[i]n capping claims arising from the termination of employment, section 502(b)(7) of the Code reflects Congress's intent to protect a debtor's estate, and in particular, other creditors of a debtor, from being burdened by exorbitant breach of employment claims." (citing *In re Murray Indus., Inc.*, 114 B.R. 749, 752 (Bankr. M.D. Fla. 1990)); *see also Bitters*, 195 B.R. at 100 ("The purpose of § 502(b)(7) is to protect the employer/debtor from valid employee claims which would unreasonably compromise the debtor's fresh start, and work to the detriment of other creditors."). On this view, courts have broadly interpreted section 502(b)(7) of the Code to cap claims arising from the termination of an employment contract, whether the claims are based on contract damages or violations of another act, like the National Labor Relations Act (the "NLRA"). *See In re Wheeling-Pittsburgh Steel*

*Corp.*, 113 B.R. 187, 193 (Bankr. W.D. Pa. 1990), *rev'd on other grounds*, 147 B.R. 874 (Bankr.

W.D. Pa. 1992). In *FairPoint*, the court rejected the claimant's assertion that a claim arising

under New Hampshire's anti-age discrimination act was exempted from section 502(b)(7)'s cap

because the claim sounded in tort rather than breach of employment contract, observing that the

"claims are all based on the employer-employee relationship, and fall squarely within the ambit

of section 502(b)(7) of the Code." 445 B.R. at 275.

Appellant argues that he "could not have filed a breach of contract suit because he was an

at-will employee, and Illinois does not recognize a cause of action for breach of an 'at-will

employment contract.'" (R. 6, Appellant's Br. at 9) (emphasis removed). From that premise,

Appellant concludes that "[b]ecause Mr. Belson's 'at-will employment contract' could not serve

as the basis for a breach of contract claim, it follows that his damages could not have 'result[ed]

from the termination of an employment contract' within the meaning of § 502(b)(7)." (*Id.* at 10)

(alteration in original). Appellant's argument misconstrues the plain meaning of section

502(b)(7), which caps employees' claims "for damages resulting from the termination of an

employment contract," 11 U.S.C. § 502(b)(7), and also misconstrues Illinois law, as discussed

below. (R. 7, Appellee's Br. at 15.)

Essentially, Appellant argues that section 502(b)(7)'s cap on damages only applies to

breach of contract claims. (R. 6, Appellant's Br. at 9-14.) This is incorrect. Section 502(b)(7) is

not limited to breach of contract claims, but rather applies to all claims "for damages resulting

from the *termination* of an employment contract," regardless of whether those damages sound in

contract or tort. 11 U.S.C. § 502(b)(7) (emphasis supplied); *see, e.g.*, *FairPoint*, 445 B.R. at 274

("First, section 502(b)(7) of the Code may cap tort claims."). Bankruptcy courts have long

recognized the difference between the "breach" of a contract and the "termination" of one. *See, e.g., Fed. Realty Inv. Trust v. Park (In re Park)*, 275 B.R. 253, 258 (Bankr. E.D. Va. 2002) ("Congress clearly knew and understood the difference between *breach* and *termination* of a lease or executory contract, as evidenced by the specific references to termination in other provisions within Section 365."); *McLaughlin v. Walnut Properties, Inc.*, 119 Cal. App. 4th 293, 300 (Cal. Ct. App. 2d Dist. 2004) ("[R]ecent federal cases have seized upon this language to conclude that Congress thereby made a clear distinction between a breach and a termination . . . we believe Congress meant what it said—a breach is different from a termination.") (internal citations omitted). By choosing the words "resulting from the termination of an employment contract," Congress intended section 502(b)(7)'s cap to apply to all claims resulting from "termination," not just breach of contract claims. 11 U.S.C. § 502(b)(7).

Under Illinois law, it is clear that Appellee and Appellant had a binding at-will employment contract. *See, e.g., Czapla v. Commerz Futures, LLC*, 114 F. Supp. 2d 715, 720 (N.D. Ill. 2000) ("That a contract is 'at-will' is significant in that an employer can discharge an employee without cause at any time. Nevertheless, an 'at-will' contract is still a contract with binding terms.") (internal citation omitted) (discussing Illinois law). The contract was terminated when Appellant was discharged. *See Jordan v. Duff and Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir. 1987). It was the circumstances of this termination that gave rise to his Claim. The Claim, therefore, falls within the plain meaning of the statutory text of section 502(b)(7) and accordingly must be capped. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what is says there. When the words of a statute are unambiguous, then,

14

this first canon is also the last: judicial inquiry is complete.") (internal citations and quotation marks omitted); *see also Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (internal citations and quotation marks omitted). Here, the disposition required by the text of section 502(b)(7) is not absurd, and so the Claim must be capped according to the plain language of the statute.

Appellant cites *Matter of Gee & Missler Services, Inc.*, 62 B.R. 841, 844 (Bankr. E.D. Mich. 1986), among other cases, for the proposition that section 502(b)(7) was intended by Congress to apply only to "key executives" with "long-term contracts calling for substantial remuneration." (R. 6, Appellant's Br. at 12.) However, nothing in the language of section 502(b)(7) supports limiting its scope in this manner and *Gee & Missler*'s interpretation of section 502(b)(7) is at odds with the vast majority of courts. *See, e.g., FairPoint*, 445 B.R. at 274. Neither *Gee & Missler* nor Appellant's brief offers a reason why the scope of section 502(b)(7) should be limited beyond the plain language of the statute itself. *See Lamie*, 540 U.S. at 534; *Germain*, 503 U.S. at 253-54. In any event, *Gee & Missler* is inapposite because it did not involve the termination of an employment contract but rather dealt with the debtor's liability for withdrawal from a multi-employer pension fund. 62 B.R. at 844-45.

Appellant's reliance on *In re Visiting Nurse Association*, 176 B.R. 748 (Bankr. E.D. Pa. 1995), is misplaced. (R. 6, Appellant's Br. at 9-14.) As Appellant himself points out, in holding that section 502(b)(7) did not apply, the court in *Visiting Nurse Association* relied on the fact that the evidence did not support the existence of a valid contract under Pennsylvania law, so no

contract termination damages were recoverable. *Id.* at 752. As described above, and as recognized by the Bankruptcy Court in this case, Illinois law views at-will employment agreements differently than Pennsylvania law, at least as interpreted by the court in *Visiting Nurse Association. See, e.g., Czapla*, 114 F. Supp. 2d at 720; *see also* (R. 1, Appeal, Ex. A at 105-06) (describing Illinois contract law and holding that it may differ from Pennsylvania contract law). Appellant attempts to salvage *Visiting Nurse Association* by arguing that "[l]ike Illinois, Pennsylvania has long recognized the concept of an 'at will employment contract.'" (R. 6, Appellant's Br. at 12.) However, the cases cited to support that proposition merely illustrate the fact that the court in *Visiting Nurse Association* misapplied Pennsylvania law in holding that an at-will employment arrangement does not give rise to an employment contract. *See Janis v. AMP, Inc*, 856 A.2d 140, 144 (Pa. Super. Ct. 2004) ("Where an employment arrangement does not contain a definite term, it will be presumed that the employment at-will rule applies. Generally *an employment contract* for a broad, unspecified duration does not overcome the presumption of an at-will employment.") (emphasis supplied) (internal citations and quotation marks omitted); *Rapagnani v. Judas Co.*, 736 A.2d 666, 670 (Pa. Super. Ct. 1999) (same).

Appellant suggests that the "relevant inquiry" in *Visiting Nurse Association* was not whether there is a contract but whether there was a contract "from which contract termination damages can flow." (R. 6, Appellant's Br. at 13) (quoting *Visiting Nurse Ass'n.*, 176 B.R. at 752) (emphasis removed). This argument puts the cart before the horse because, as noted, the court's decision in *Visiting Nurse Association* was based on the finding that no employment contract existed. 176 B.R. at 752. The Appellant concludes that "[b]ecause Mr. Belson's damages did not flow from the termination of a contract, but rather from the tortious act of Olson

Rug, the § 502(b)(7) cap does not apply." (R. 6, Appellant's Br. at 13.) Appellant does not cite any Illinois caselaw to support this assertion. Moreover, Appellant does not explain what the "tortious act of Olson Rug" was if not the termination of Appellant's employment.

As further support for his argument, Appellant cites *In re Ajay Sports, Inc.*, 370 B.R. 703 (Bankr. E.D. Mich. 2007), but again misreads the law. (R. 6, Appellant's Br. at 13-15.) The court in *Ajay* begins its analysis by correctly noting that section 502(b)(7) of the Bankruptcy Code "is not limited in its application to claims for *breach* of contract, but instead applies to any claims *resulting from the termination* of an employment contract." 370 B.R. 707-08. The *Ajay* court also correctly recognized that the creditor's rights in bankruptcy depend upon the underlying state law giving rise to the claim (Michigan in that case) and noted that, under Michigan law, "even at will employees have employment contracts" and, further, that "there was an employment contract between the Debtors and [the creditor]." *Id.* at 708-09.

From this premise, however, the *Ajay* court quickly goes astray. In purporting to apply Michigan law, the *Ajay* court looked to the creditor's complaint, rather than Michigan statutes or caselaw, to determine the relevant state law. *See id.* at 711. The court noted that while the complaint "alleged that the Debtors wrongfully discharged [the creditor]," it "did not even allege the existence of an employment contract, or the breach of an employment contract." *Id.* The court then noted that "the jury verdict did not ask whether the Debtors violated an employment contract with [the creditor]. Nor did the jury verdict ask whether the Debtors caused [the creditor] to suffer damages by reason of a violation of an agreement not to terminate an employment contract with [the creditor]." *Id.* According to the *Ajay* court, although *breach* of the employment contract is not necessary for section 502(b)(7) to apply as a cap on a claim for

damages, the cap did not apply to the creditor's claims because the complaint did not allege the "breach of an employment contract" or the "violation of an agreement not to terminate an employment contract." *Id.* Thus the court in *Ajay* concluded that the damages awarded to the creditor "were not on account of, nor did they result from, breach or termination of any employment contract, but rather were awarded based upon the recognized tort in Michigan law for discharge in violation of public policy." *Id.* at 712.

The *Ajay* court does not explain the difference between the "discharge" of an employee who is employed pursuant to an at-will employment contract and the "termination" of that employee's employment contract—or how one could be said to occur without the other under Michigan law. Presumably they are different, under Michigan law, for while the "discharge" of the employee is a necessary element of the tort of retaliatory discharge, the "termination" of the employment contract (which, in any other circumstance, would seem to follow logically from the "discharge") is, in fact, something entirely different, at least according to the court in *Ajay*. *Id.* at 711-12. More importantly, under the *Ajay* court's interpretation of Michigan law, "termination" of the plaintiff's employment contract is not a necessary element of the tort, and thus damages that flow from the tort cannot be said to result from termination of the employment contract. *See id.* Even assuming that the *Ajay* court applied a correct interpretation of Michigan law, it is not an accurate statement of Illinois law, and Appellant's reliance on it is in error. (R. 7, Appellee's Br. at 19-20.)

Under Illinois law, the tort of retaliatory discharge consists of three elements: (1) the employer discharged the plaintiff; (2) the discharge was in retaliation for the plaintiff's activities; and (3) the discharge violated a clear mandate of public policy. *See Bell v. Don Prudhomme*

18

*Racing, Inc.*, 939 N.E.2d 100, 107 (Ill. App. Ct. 4th Dist. 2010). "In the employment context 'discharge' means the release, dismissal, or termination of an employee." *Id.* (internal quotation marks omitted). As noted above, under Illinois law, even an at-will employment arrangement constitutes an employment contract. *See, e.g., Czapla*, 114 F. Supp. 2d at 720. Moreover, "[the Illinois Supreme Court] has not expanded the tort of retaliatory discharge to encompass any behavior *other than the actual termination of employment*." *Bell*, 939 N.E.2d at 107 (quoting *Welsh v. Commonwealth Edison Co.*, 713 N.E.2d 679, 683 (Ill. App. Ct. 1st Dist.1999)) (emphasis supplied) (internal quotation marks omitted). Under Illinois law, the existence of an at-will employment contract and the termination of that employment contract are not only necessary elements of the tort of retaliatory discharge, they are the essence of the cause of action, and plaintiffs "must also prove that their exercise of rights was 'a proximate cause' of their termination." *Grabs v. Safeway, Inc.*, 917 N.E.2d 122, 129 (Ill. App. Ct. 1st Dist. 2009). Even if one assumes that the distinction the *Ajay* court drew between the "discharge" of an at-will employee and the "termination" of his at-will employment contract holds up under Michigan law, the distinction finds no support in Illinois law.

Appellant's efforts to distinguish cases such as *FairPoint*, 445 B.R. 271, are based on the same mischaracterization of the law. (R. 6, Appellant's Br. at 16) ("Because Mr. Belson did not have an enforceable employment contract, these cases are inapplicable."). As noted above, Illinois law makes clear that Appellant did have an enforceable employment contract and that his damages resulted from the termination of that employment contract. *See, e.g., Czapla*, 114 F. Supp. 2d at 720. Moreover, contrary to Appellant's assertion, *FairPoint* is not alone in holding that section 502(b)(7) does not distinguish between tort and contract claims. (R. 6, Appellant's

Br. at 16.) For example, two of the cases cited in the Objection, and also by Appellant, involved both tort or statutory damages (like Appellant's Claim), as well as contractual damages, all of which were held to be subject to section 502(b)(7)'s cap on damages. *See Handy Andy*, 1997 WL 401583, at \*4, \*6 (discussing the claimant's causes of action under the Illinois Wage Payment and Collection Act, 820 Ill. Comp. Stat. 115/1 *et seq.*, and the Illinois Attorneys Fees in Wage Actions Act, 705 Ill. Comp. Stat. 225/0.01 *et seq.*); *Anthony*, 96 F.3d at 695-97 (involving a claim for wrongful termination of an employment contract). As noted above, Appellant's distinction between tort and contract damages is not supported by the plain text of section 502(b)(7) or the caselaw interpreting that section of the Code.

Appellant also cites *In re Holm*, 931 F.2d 620 (9th Cir. 1991), as support for the view that contract damages are distinct from tort damages, and that only the former are subject to section 502(b)(7)'s cap. (R. 6, Appellant's Br. at 16-18.) Appellant's reliance on *Holm* is misplaced. In *Holm*, the court held that the "relationship between the parties was that of shareholders of a corporation rather than an employer-employee relationship. These claims based on a shareholder status are not subject to the limitation of section 502(b)(7)." *Id.* at 623. Whether the claims in *Holm* sounded in contract or tort was irrelevant because the claims did not result from the termination of an employment contract. *See id.* Further, in urging this Court to follow *Holm*, Appellant micharacterizes the plain language of section 502(b)(7), arguing that it does not apply to tort claims. (R. 6, Appellant's Br. at 16-18.) Section 502(b)(7) makes no such distinction; it does not require that a claim be for breach of an employment contract, but rather that a claim be "for damages resulting from the *termination* of an employment contract," as Appellant's Claim is. 11 U.S.C. § 502(b)(7) (emphasis supplied).

But for the termination of his at-will employment contract, Appellant would have no claim for retaliatory discharge at all. Because, under Illinois law, the termination of Appellant's at-will employment contract is a necessary element of his retaliatory discharge claim, his Claim can only be said to be one for "damages resulting from the termination of an employment contract." 11 U.S.C. § 502(b)(7). Accordingly, the Bankruptcy Court did not err by reducing Appellant's Claim pursuant to section 502(b)(7) of the Bankruptcy Code.

## CONCLUSION

The Bankruptcy Court did not err in holding that Appellant's Claim is not entitled to priority status pursuant to 11 U.S.C. § 507(a)(4), nor did it err by reducing Appellant's Claim pursuant to 11 U.S.C. § 502(b)(7). Therefore, the order of the Bankruptcy Court sustaining Appellee's Objection to Appellant's Claim is AFFIRMED. The Clerk of the Court is directed to enter final judgment in favor of Appellee Olson Rug Company.

ENTERED: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated: October 1, 2012**